IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CHASE TREVOR KAUFMANN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:21cv00511 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DUSTIN L. FOLEY, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Plaintiff Chase Trevor Kaufmann, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983, alleging that Lieutenant Dustin Foley used excessive force while arresting Kaufmann. This matter is before the court on Lt. Foley's motion for summary judgment. Having reviewed the record, the court concludes that Lt. Foley has established that there are no genuine issues of material fact, and that he is entitled to summary judgment. Accordingly, the court will grant his motion.

I.

**A. Kaufmann's Complaint**

Kaufmann alleges that on September 21, 2021, Lt. Foley of the Patrick County Sheriff's Office responded to "a call." (Compl. at 3 [ECF No. 1].) Kaufmann claims that when Lt. Foley "arrived on the scene," he "failed to take either person's statements" and stated that "he didn't want to deal with this." (*Id.*) Lt. Foley arrested both Kaufmann and his brother Trent. Kaufmann alleges that he was placed in handcuffs, "put in the back of" the police car, and "tased three times in [his] leg or left and right thigh[,] grabbed by [his] neck, pushed [and] pulled back from out [of] the car to the ground[, and] pushed back in the police car." (*Id.*)

Kaufmann contends that Lt. Foley used excessive force in arresting him. As relief, Kaufmann requests that the court terminate Lt. Foley from his employment with the Patrick County Sheriff's Department.[1]

### B. Lt. Foley's Motion for Summary Judgment

Lt. Foley filed a motion for summary judgment, arguing that his use of force against Foley was reasonable and not excessive. In support of his motion, Lt. Foley provided a declaration and two videos of the incident. (ECF Nos. 21-2 & 21-3.) The first video, taken from Lt. Foley's dash camera, does not show any of the relevant action (as it is a stationary camera mounted to the dashboard of his car), but it did record relevant audio of Lt. Foley's interaction with Kaufmann before other officers arrived. The second video is from the body camera of Officer Jesse Pickerel, one of the officers who responded to assist Lt. Foley. That video clearly depicts Kaufmann's actions once other officers arrived on the scene. The videos corroborate Lt. Foley's description of the events in his declaration.[2]

---

[1] As the court previously noted in its April 8, 2022 Memorandum Opinion (ECF No. 17), federal courts lack authority to terminate state employees from their job duties. *See Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1997) ("We all understand, of course, that federal courts have no authority to address state officials out of office or to fire state employees or to take over the performance of their functions."), *rev'd in part on other grounds, Alabama v. Pugh*, 438 U.S. 781 (1978); *Maxton v. Johnson*, 488 F. Supp. 1030, 1037 n. 2 (D.S.C. 1980) (citing *Shole v. Daly*, No. 75-1704 (4th Cir. 1976)) ("Federal courts lack the authority to remove or reassign state employees"). In Virginia, a sheriff appoints his or her deputies, and, except in limited circumstances, has the sole authority to remove deputies from office. Va. Code §§ 15.2-1603; 24.2-230; *see also McCaffrey v. Chapman*, 921 F.3d 159, 162, 168 (4th Cir 2019). The only exceptions to this rule are that a court is authorized to remove a sheriff's deputy from office if the deputy is (1) sentenced for committing certain crimes or (2) determined mentally incompetent. Va. Code §§ 15.2-1603; 24.2-230. Neither of these exceptions apply here.

[2] In *Scott v. Harris*, 550 U.S. 372, 380 (2007), the Supreme Court said that, when "opposing parties tell two different stories," one of which is blatantly contradicted by video evidence in the record "so that no reasonable jury could believe it, a court should not adopt that version of the facts. . . ." Rather, a court should "view[] the facts in the light depicted by the videotape." *Id.* at 381; *see also Sawyer v. Asbury*, 537 F. App'x. 283, 291 (4th Cir. 2013).

In a declaration in support of his motion, Lt. Foley stated that, on September 21, 2021, shortly after starting his shift, a call came in over the radio asking for someone to break up a fight between two brothers at the Virginian Motel. (Foley Decl. ¶ 2 [ECF No. 21-1].) Lt. Foley responded to the call. When he first arrived at the motel, he was the only officer on the scene. Lt. Foley scanned the motel's parking lot and saw Kaufmann standing with his mother. Lt. Foley "immediately recognized" Kaufmann from prior encounters with local law enforcement. Lt. Foley stated that, on speaking with Kaufmann, he "soon realized that he was intoxicated," as he was slurring his words and smelled of alcohol. (*Id.* ¶ 5.) During the conversation, Lt. Foley learned that Kaufmann and his brother Trent had gotten into a fist fight. Lt. Foley could see Kaufmann had been hit in the face. After determining that Trent was in a motel room, Lt. Foley went to that room. A man opened the door and identified himself as Trent Kaufmann. Lt. Foley questioned Trent about the fight, and Trent confirmed what had occurred between himself and Kaufmann. Trent told Lt. Foley that Kaufmann was sitting in the back seat of a car while Trent was in the front seat. Kaufmann was annoying Trent because Kaufmann kept hitting the back of Trent's seat. Kaufmann then hit Trent in the back of his head. Trent then turned around and punched Kaufmann in the face. A fight ensued.

After speaking with Trent, Lt. Foley arrested Trent for domestic assault and placed him in the back of his police car. Lt. Foley then went over to Kaufmann and told him that he was under arrest for domestic assault and for being intoxicated in public. Lt. Foley ordered Kaufmann to give him his hands to be handcuffed and Kaufmann cooperated. They then walked over to Lt. Foley's police car where Foley opened the passenger side door and asked Kaufmann to get in the vehicle. Kaufmann refused and became "combative." (*Id.* ¶ 11; Foley

Dash Cam at 1:44–3:00 [ECF No. 21-2].) Lt. Foley gave Kaufmann several more commands to get in the vehicle and "attempted to manually direct him into the vehicle," but Kaufmann did not listen and was "too large to be forced into the vehicle by [Lt. Foley] acting alone." (Foley Decl. ¶ 11.) Lt. Foley asserts that he began to worry about his safety. (*Id.*) He states that Kaufmann was intoxicated, swearing, and "visibly angry," and that "it was clear he was going to put up a fight." (*Id.* ¶ 12; Dash Cam at 1:44–3:00.) Lt. Foley warned Kaufmann that if he did not get in the vehicle, Foley would use his taser on him. Kaufmann continued resisting and Lt. Foley used his taser on Kaufmann's leg.[3] (Foley Decl. ¶ 12–13; Dash Cam at 2:25–2:45.) After tasing Kaufmann's leg, Lt. Foley was able to push Kaufmann into his car, but even though Kaufmann was sitting in the seat of the car, his legs were still outside the vehicle. Lt. Foley told Kaufmann that he needed to put his feet in the car, and warned that if he did not, he would tase him again. (Foley Decl. ¶ 13.) Kaufmann refused and started kicking his feet at Lt. Foley.[4] (Foley Decl. ¶ 13–14; Foley's Dash Camera 2:47–2:55.) Because Lt. Foley viewed Kaufmann's actions as a threat to his safety, he attempted to tase Kaufmann's leg again. (Foley Decl. ¶ 14.) But Lt. Foley was unable to tase him because Kaufmann was kicking wildly, and Foley could not make contact with Kaufmann's leg. (*Id.*) Further, while Kaufmann was kicking, he reached out and grabbed Lt. Foley's taser. (Kaufmann's hands were

---

[3] Lt. Foley avers that he used the "drive-stun feature" of his taser. (Foley Decl. ¶ 12.) The drive-stun feature requires the taser be firmly placed against the subject's body. Simply touching the taser to the subject is not sufficient; the taser only works if it is firmly held to the subject's body. Lt. Foley states that he chose to use the drive-stun feature on Kaufmann's leg because he believed that if he could stun Kaufmann's leg, that would cause his leg to become weak, and therefore give Lt. Foley the ability to push Kaufmann into the police car. (*Id.*)

[4] As noted, while neither video captured Lt. Foley's initial tussle with Kaufmann, his dash cam recorded the sounds, including Lt. Foley repeatedly telling Kaufmann to "sit down" prior to deploying his taser, and Trent admonishing Kaufmann to "stop fighting" Lt. Foley. (Dash Cam at 1:25–3:15.)

cuffed in front of his body.) Lt. Foley struggled with Kaufmann and was able to retrieve the taser and throw it onto the hood of the cruiser. (*Id.* ¶ 15; Dash Cam at 2:40−2:46.)

Having failed to secure Kaufmann in his cruiser, Lt. Foley placed him on the ground to wait for backup. (Foley Decl. ¶ 15−16.) Lt. Foley held him there for approximately two minutes until two other officers arrived on the scene. They assisted Lt. Foley in standing the irate Kaufmann up. As they did, Kaufmann attempted to kick one of the officers, and he screamed, cussed, and spat at them. (Foley Decl. ¶ 16; Pickerel Body Cam at 0:19−0:49 [ECF No. 21-3].) One of the other officers retrieved a spit mask from his vehicle and put it over Kaufmann's mouth; the officers then walked Kaufmann over to the back of the vehicle. (Foley Decl. ¶ 18; Body Cam at 1:00−1:45.)

Lt. Foley stated that when they got to the back of the vehicle, Kaufmann "purposely" banged his head against the side of the vehicle. (Foley Decl. ¶ 19; Body Cam at 1:47−2:02.) The officers patted Kaufmann down to search for any weapons and then directed him into the vehicle. (Foley Decl. ¶ 20; Body Cam at 2:00−3:00.) Kaufmann sat in the seat, but again refused to put his feet in the vehicle. (Foley Decl. ¶ 21; Body Cam at 2:00−3:05.) The officers attempted to lift Kaufmann's feet up and put them inside the vehicle, but Kaufmann continued to resist and kick the officers. (Foley Decl. ¶ 22; Body Cam at 3:00−4:22.) Lt. Foley attempted to tase Kaufmann but, because of the subject's belligerence, could not make contact with his skin. (Foley Decl. ¶ 22; Body Cam at 3:44−4:07.) Eventually, the officers were able to get Kaufmann's feet inside the vehicle and Kaufmann was transported to the jail.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315−16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider

inadmissible hearsay in an affidavit filed with motion for summary judgment). A verified complaint "is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

### III. Kaufmann's Motion to Amend

Kaufmann filed a motion to amend his complaint to bring a false arrest claim against Lt. Foley. (ECF No. 19.) In support of his proposed amendment, Kaufmann alleges that Lt. Foley failed to "take either person's statements" before arresting Kaufmann. While leave to amend shall be freely given when justice so requires, *see* Fed. R. Civ. P. 15(a), it should be denied when the amendment would be futile. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). Here, Kaufmann's amendment would be futile because his allegations fail to state a colorable claim of false arrest against Lt. Foley. The court will therefore deny his motion.

Section 1983 provides a federal cause of action for false arrest in violation of the Fourth Amendment. *Wallace v. Kato*, 549 U.S. 384 (2007). To state such a claim, a plaintiff must allege that the defendant caused a seizure of the plaintiff pursuant to legal process, unsupported by probable cause, and the criminal proceedings terminated in plaintiff's favor. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). Kaufmann does not allege that criminal proceedings terminated in his favor and, thus, his claim fails.

But even if the court were to grant the motion to amend, Lt. Foley has shown that he is entitled to summary judgment on this claim. The "existence of probable cause is an absolute defense to a wrongful arrest claim brought against an officer under 42 U.S.C. § 1983." *Allen v. Deel*, No.4:20cv38, 2021 U.S. Dist. LEXIS 230009, at *7–8 (W.D. Va. Dec. 1, 2021) (citation

omitted). Probable cause exists if the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person. . . in the circumstances shown, [to conclude] that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). When making a probable cause determination "it is irrelevant what crime a suspect is eventually charged with," or whether he is charged at all. *Sennett v. United States*, 667 F.3d 531, 535 (4th Cir. 2012) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). In fact, evidence sufficient to secure a conviction is not a requirement in a probable cause analysis. *Wilson v. Town of Mt. Jackson*, No. 5:21cv00055, 2022 U.S. Dist. LEXIS 47678, at *15 (W.D. Va. Mar. 17, 2022) (citing *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019)). To determine whether probable cause existed at the time of arrest, two factors must be considered: (1) the suspect's conduct at the time of arrest, and (2) the contours of the offense thought to be committed by that conduct. *Id.*

Applying these factors to Kaufmann's public intoxication and domestic assault arrests, the court concludes that there was ample probable cause to arrest Kaufmann on both charges. It is a misdemeanor for a person to be drunk in public. Va. Code § 18.2-33 (2022). Lt. Foley determined Kaufmann was intoxicated because he smelled of alcohol and was slurring his words. (Foley Decl. ¶ 5.) Given Lt. Foley's observations, he had probable cause to arrest Kaufmann for public intoxication. Further, Lt. Foley had probable cause to arrest Kaufmann for domestic assault. "Any person who commits an assault and battery against a family or household member is guilty of a Class 1 misdemeanor." Va. Code § 18.2-57.2 (2022). Lt. Foley was dispatched to the Virginian Motel due to a caller reporting a fight. (Foley Decl. ¶ 2.) After speaking with both Kaufmann and Trent, Lt. Foley confirmed that it was these two men that

were fighting. (Foley Decl. ¶¶ 5 & 8.) The information Lt. Foley learned during the course of his investigation was enough to establish probable cause to arrest Kaufmann for domestic assault. For these reasons, the court concludes that Kaufmann's proposed amendment would be futile.

## IV. Excessive Force

Kaufmann alleges that Lt. Foley used excessive force against him during his arrest. Claims of excessive force during an arrest are analyzed under the Fourth Amendment, which applies an objective "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). The reasonableness test is an objective inquiry that asks the question of "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). A court must consider whether the officer's actions were reasonable at the time of the incident, without the benefit of hindsight, and with the understanding that officers must often make split-second decisions in rapidly changing circumstances. *Id.* When considering an excessive force claim, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 352, 383 (2007). The court must consider three factors in this balancing: "(1) the severity of the crime at issue; (2) the extent to which the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Lee v. Bevington*, 647 F. App'x 275, 283 (4th Cir. 2016) (citing *Graham*, 490 U.S. at 396). The court should also consider the extent of any injury suffered. *Jones*, 325 F.3d 520, 527 (4th Cir. 2003). But these factors are not

exhaustive. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The ultimate question is whether "the totality of the circumstances justified a particular sort of. . . seizure." *Jones*, 325 F.3d at 527.

When evaluating an excessive force claim where a taser is deployed during the course of a seizure, courts first apply the *Graham* factors. *See Cansler v. Hanks*, 777 F. App'x 627, 635 (4th Cir. 2019); *Yates v. Terry*, 817 F.3d 877, 887–88 (4th Cir. 2016); *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 899–05 (4th Cir. 2016). If the *Graham* factors weigh in favor of the officer, he is deemed to have acted objectively reasonable in light of the circumstances. *See Estate of Armstrong*, 810 F.3d at 906. But if the *Graham* factors weigh in favor of the arrestee, a court must consider whether an arrestee's actions raised a risk of immediate danger that outweigh the *Graham* factor analysis. *Id.* If the arrestee did pose such immediate risk, the officer's taser use is deemed objectively reasonable. *Id.*

Applying the *Graham* factors, the court determines that Lt. Foley's decision to deploy his taser was objectively reasonable. After Lt. Foley told Kaufmann he was being arrested for domestic assault and public intoxication, he attempted to put Kaufmann in his police cruiser. (Foley Decl. ¶¶ 10–12.) Although Kaufmann was handcuffed (in the front), he was actively resisting Lt. Foley's commands to get in the vehicle. (*Id.* ¶¶ 11–12.) Lt. Foley could not push Kaufmann into the vehicle because Kaufmann actively resisted and threatened the officer. (*Id.*; *see generally* Dash Cam.) He was yelling at Lt. Foley and appeared visibly angry, and Lt. Foley was justifiably worried that Kaufmann was going to become violent. *See Smalls v. Dorchester Cnty. Sheriff's Dep't*, No. 9:10-0421-MBS-BM, 2011 U.S. Dist. LEXIS 28460, at *19 (D.S.C. Feb. 16, 2011) (explaining domestic assault is a crime involving violence and often creates

"tense, unpredictable, and occasionally even dangerous" situations). Due to the escalating nature of the situation, and after giving Kaufmann several opportunities to comply with his commands and warning Kaufmann that he was about to deploy his taser, Lt. Foley used his taser on Kaufmann's leg one time. (Foley Decl. ¶ 12.)

After deploying his taser, Lt. Foley was able to push Kaufmann into his police car but, despite Kaufmann being seated in the vehicle, his legs were still outside the vehicle. (*Id.* ¶¶ 12–13.) Lt. Foley told Kaufmann to put his legs inside the vehicle several times, but Kaufmann refused to comply and began kicking at him. (*Id.* ¶ 14.) Once Kaufmann started kicking at Lt. Foley, the officer, again, attempted to deploy his taser. (*Id.*) This time, the taser did not make contact with Kaufmann's legs because Kaufmann was kicking at Lt. Foley. (*Id.*) Additionally, while the taser was in Lt. Foley's hands, Kaufmann grabbed the taser. (*Id.* ¶ 15.) Kaufmann and Lt. Foley struggled with the taser briefly and Lt. Foley was able to get the taser away from Kaufmann by throwing it on the hood of the police cruiser. (*Id.*; Dash Cam at 2:40−2:46.)

All three *Graham* factors heavily weigh in favor of Lt. Foley: (1) Kaufmann's crime was "severe" since it was a violent crime; (2) Kaufmann posed a safety risk due to his aggressive resistance; and (3) Kaufmann was actively resisting arrest. Additionally, Kaufmann does not allege that he suffered even a minor injury as a result of this incident. Even if the *Graham* factors weighed in favor of Kaufmann, Lt. Foley reasonably perceived Kaufmann as an immediate safety risk because Kaufmann was actively resisting arrest, kicking at Lt. Foley, and grabbing for a weapon (Lt. Foley's taser). Having reviewed the evidence, the court concludes that there is no genuine dispute of material fact that Lt. Foley's use of force in deploying his

taser while he was alone with Kaufmann was reasonable and, thus, Lt. Foley is entitled to summary judgment.[5]

## IV.

For the reasons stated, the court will grant Lt. Foley's motion for summary judgment.

The clerk shall send a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 7th day of December, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[5] Lt. Foley also subsequently deployed his taser on another occasion where the taser did not make contact with Kaufmann's body. (Foley Decl. ¶ 14, 22.) Since no contact was made, the court cannot conclude that Lt. Foley's force was excessive. But, even if the taser had made contact with Kaufmann, the use of force was reasonable at the time of the incident. After the two other officers arrived at the scene, they helped Lt. Foley stand Kaufmann up. (Foley Decl. ¶ 17; Body Cam at 0:11–0:40.) The officers put a spit mask on Kaufmann because he was spitting at the officers (Foley Decl. ¶ 19; Body Cam at 1:00–1:45), and then walked him to the back of the police cruiser. (Body Cam at 1:45–1:55.) When Kaufmann got next to the vehicle, he slammed his own head on the vehicle (*Id.* at 1:55–2:00). After the officers opened the vehicle's door, Kaufmann refused to get in, actively pulled away from the officers, yelled at them, and swore. (*Id.* at 2:00–3:05.) After all three officers pushed Kaufmann into the vehicle, Kaufmann refused to put his feet inside the vehicle. (*Id.* at 3:05–3:20.) Instead, Kaufmann started kicking at the officers. (*Id.* at 3:20–4:10.) Lt. Foley attempted to tase Kaufmann's leg while Kaufmann was kicking, but he was unable to make contact with his leg. (*Id.* at 3:45–4:10; Foley Decl. ¶ 22.) Finally, officers were able to physically move Kaufmann's legs into the vehicle. (Body Cam at 4:15–4:22.) Even if the taser had made contact with Kaufmann's leg, application of the *Graham* factors weighs heavily in favor of Lt. Foley. As the court has discussed, Kaufmann was being charged with a violent crime and he was resisting arrest. Moreover, Kaufmann was kicking at the officers, trying to spit at them, and screaming at them. Under these circumstances, the court concludes that Lt. Foley's use of force was reasonable.